NOYES and others, Appellants, vs. QVALE, Garnishee, etc., Respondent.

*November 7 — November 22, 1887.*

*Debtor and creditor: Fraudulent conveyance: Voluntary assignment.*

The transfer of a debtor's whole stock to a creditor in satisfaction of a debt greater than the value of the stock, unaccompanied by any trust in favor of the debtor or other creditors, is not fraudulent as to other creditors; nor is it an assignment for the benefit of creditors, within the meaning of sec. 1694, R. S., or sec. 1, ch. 349, Laws of 1883.

APPEAL from the Circuit Court for *Eau Claire* County.

Garnishment. The facts are stated in the opinion. The plaintiffs appealed from a judgment in favor of the garnishee.

*V. W. James*, for the appellants, to the point that the transfer of all of the defendant's stock to the garnishee amounted to a voluntary assignment for the benefit of creditors, cited *Winner v. Hoyt*, 66 Wis. 227; *Martin v. Hausman*, 14 Fed. Rep. 166; *Dahlmon v. Jacobs*, 15 id. 863; *S. C.* 16 id. 614; *Kellogg v. Richardson*, 19 id. 70; *Clapp v. Dittman*, 21 id. 15, 737; *Clapp v. Nordmeyer*, 25 id. 71; *Freund v. Yaegerman*, 26 id. 812; *State ex rel. Feldkamp v. Morse*, 27 id. 261; *Lamar v. Pool*, 26 S. C. 441; *Verner v. McGhee*, id. 249, 607; *Wilks v. Walker*, 22 S. C. 110; *Austin v. Morris*, 23 id. 406.

*W. F. Bailey*, for the respondent.

TAYLOR, J. The appellants, creditors of E. Selmer, brought an action against him to recover their debt, and in that action they garnished the respondent, *Qvale*. *Qvale* answered by denying that he had in his possession any property of any kind belonging to the defendant Selmer. The appellants took issue upon his answer, and that issue was tried by the court without a jury.

*Qvale* was the only person sworn on the trial upon the question as to whether he had any property in his possession belonging to Selmer. The substance of his testimony is as follows: *Qvale* testified that on the 11th day of August, 1886, he had no property in his possession belonging to Selmer; that prior to that date he had received a bill of sale of a certain drug stock from Selmer in the city, and that stock was in his possession at the time the garnishee summons was served; that he received the bill of sale and possession of the stock from Selmer on the 31st day of July, 1886; the value of the stock was between $3,200 and $3,300; no

inventory was taken since February, 1886; he also received book accounts for $75 to $100. The consideration for the transfer to him was $4,125, money he had lent to Selmer in January and February, 1885; had loaned him $300 since February. "I took notes for the entire amount, secured by chattel mortgage in October or November, 1885, on the stock and fixtures. The chattel mortgage was for the sum of $3,600 or $3,700. Never took possession under this chattel mortgage, but had the mortgage filed in the clerk's office." Afterwards he removed the chattel mortgage from the files, and canceled the same. The reason given for removing the chattel mortgage from the files and canceling the same, was to prevent being taxed for the amount of it. He also said he canceled the notes mentioned in the mortgage, and simply charged Selmer with the moneys loaned in his account against him. "In January or February, 1886, I loaned Selmer $130. He paid back a part of this, and I again loaned him a little; the last loan was in July, 1886. The price agreed upon by Selmer and me for the purchase of the stock was his indebtedness to me. I proposed the trade July 29 or 30, 1886, a day or two before the bill of sale was made. There was a good deal said about the trade. Selmer accepted the proposition, and gave the bill of sale. I gave him a day or two to consider, I think; it was not accepted immediately. Mr. Salsbury was present when the papers were made. My object in buying this store was to realize my money that I had lent to Selmer. I canceled my account against him for the money loaned, when he gave me the bill of sale of the store; the notes had been canceled before that. I never knew what Selmer owed until the day before I took the bill of sale. I was then informed that he owed $1,400 to $1,700. He claimed it was only about $600. At the time I let Selmer have this money, he had no property that I knew of. I staked the money on the

risk of his success in the business. I took possession of the stock immediately on the day of the bill of sale. Selmer was to remain there at an agreed salary, and I was to pay him $75 per month. I hired him for no definite time. My object was to sell the store, and I have offered it at a discount. ·I surrendered this debt for this stock in order to get my pay. My opinion at the time I took the stock was the same as now as to its value, and I proposed to give him the debt of about $3,300 for the stock. I knew one or two of his creditors were crowding him at the time I took the stock for my debt." "The money was paid to Selmer within a week or ten days; it was paid when Selmer brought in bills to be paid. I did this simply to help Selmer get into business, and not for speculation. There is no agreement that Selmer is to receive anything further out of this stock or otherwise. The property that was transferred to me by the bill of sale was all the property Selmer had, so far as I know."

The only other evidence in the case was the testimony of V. W. James, as to the insolvency of Selmer at the time he sold the stock to *Qvale*. The learned circuit judge decided in favor of the garnishee, and consequently must have found that there was no fraud, in fact or in law, in the sale from Selmer to *Qvale*, the garnishee. As to the question of fraud in fact in the sale, it is very clear that the decision is fully sustained by the evidence. The evidence, if to be believed, and there is nothing in the case which shows it is not worthy of belief, shows that the garnishee, for reasons sufficient in his mind, advanced money to set the defendant, Selmer, up in the business of a druggist, and that, when he found that the business was not likely to turn out advantageously for either party, to secure himself, in part at least, for the money advanced, he took the stock in satisfaction of his debt. The consideration was ample, and considerably more than the stock was worth. He was as well entitled to get

his pay as any other creditor of Selmer, and if Selmer saw fit to pay him by a sale of his property to him at a large price he had the right to do so. Fraud is not to be presumed, but must be proved; and it being admitted upon this evidence, as we think it must be, that Selmer was indebted to *Qvale* between $3,000 and $4,000, there is nothing in the evidence which could justify any court in holding the transaction fraudulent in fact as to the other creditors.

The learned counsel for the appellant has made a point that the sale amounts to a legal fraud on the other creditors, and is therefore void. It is claimed that the sale of stock to *Qvale* is in effect a voluntary assignment within the meaning of the law, and is therefore void because there has been no compliance with the law regulating such assignments, and *Winner v. Hoyt*, 66 Wis. 227, and several other cases in the Federal Reporter, as well as in the supreme court of Missouri, are cited to maintain this proposition. For our answer to this point made by the learned counsel, we refer to the opinion of Justice CASSODAY in the case of *Ingram v. Osborn*, *ante*, p. 184, which is filed at the same time with this opinion.

*By the Court.*— The judgment of the circuit court is affirmed.